UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Douglas Desjardins and
Stephanie Desjardins,
Plaintiffs

v.

Case No. 12-cv-272-SM
Opinion No. 2013 DNH 086

Fidelity National Title
Insurance Company,
Defendant

**O R D E R**

Douglas and Stephanie Desjardins bring this action seeking a judicial declaration that they are entitled to coverage under their homeowners' title insurance policy. The policy was issued by the predecessor in interest to the defendant, Fidelity National Title Insurance Company ("Fidelity"). The Desjardins also seek damages for Fidelity's alleged breach of contract. Fidelity denies that the Desjardins' policy provides coverage under the circumstances presented in this case.

Pending before the court are the parties' cross-motions for summary judgment. For the reasons stated, plaintiffs' motion is granted, and defendant's motion is denied.

**Standard of Review**

A. Summary Judgment Standard.

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

B. Interpretation of Insurance Policies.

Construing the meaning and scope of language used in an insurance policy presents questions of law for the court to resolve. Under New Hampshire's rules of construction:

> Where disputed terms are not defined in a policy or by State judicial precedent, we apply an objective standard, construing the terms in context and as would a reasonable person in the position of the insured, based upon more than a casual reading of the policy as a whole. If the policy language may reasonably be interpreted in more than one way and one interpretation

> supports coverage, any ambiguity is construed in favor of the insured and against the insurer. Absent ambiguity, however, our search for the parties' intent is limited to the words of the policy.

Panciocco v. Lawyers Title Ins. Corp., 147 N.H. 610, 613 (2002) (citations omitted).

It bears noting that, at least with respect to the first count in the Desjardins' complaint (seeking a declaratory judgment that they are entitled to coverage), Fidelity bears the burden of proof under applicable New Hampshire law. See N.H. Rev. Stat. Ann. ("RSA") 491:22-a ("In any petition under RSA 491:22 to determine the coverage of a liability insurance policy, the burden of proof concerning the coverage shall be upon the insurer whether he institutes the petition or whether the claimant asserting the coverage institutes the petition."). Moreover, should the Desjardins prevail on that claim, they will be entitled to an award of "court costs and reasonable attorneys' fees from the insurer." RSA 491:22-b.

**Background**

In May of 2008, the Desjardins purchased a home at 15 Grappone Road, in Moultonborough, New Hampshire, also known as Lot 3 (the "Property"). The Property is part of a subdivision near Lake Winnipesaukee and includes an appurtenant easement to

use a waterfront lot known as Lot 12 for, among other things, swimming and boating.[1]

At the closing, the Desjardins purchased a title insurance policy from Fidelity's predecessor in interest. Subject to various conditions, exceptions, and exclusions, the "Policy insures [the Desjardins'] title to the land described in Schedule A." Exhibit 1 to Plaintiffs' Reply Memorandum (document no. 18-2) (the "Policy"), "Owner's Coverage Statement." The Policy defines the insured "land" to include <u>both</u> the lot on which the Desjardins' home is located (Lot 3), as well as their easement over Lot 12, which is described as follows:

> [T]he right to use, in common with Grappone, Inc., its successors and assigns, Lot #12 as shown on [Plan #27059, recorded in the Carroll County Registry of Deeds at Book 27, Page 59] for purposes of bathing,

---

[1] "An easement is a nonpossessory interest in real property that can be created by written conveyance, prescription or implication. An appurtenant easement is an incorporeal right generally created for the purpose of benefitting the owner of the dominant estate and that runs with the land, is incapable of existence separate and apart from the dominant tenement, and is inheritable." <u>Cricklewood on the Bellamy Condo. Ass'n v. Cricklewood on the Bellamy Trust</u>, 147 N.H. 733, 737 (2002) (citations and internal punctuation omitted).

Moreover, an appurtenant easement is such an integral part of an interest in real property, that it automatically passes with that property, even if it is not specifically referenced in the deed by which title is transferred. <u>See</u> RSA 477:26. <u>See also</u> <u>Mansur v. Muskopf</u>, 159 N.H. 216, 222 (2009) ("[E]asements automatically pass with the transfer of property to which they are appurtenant, even when absent from the face of the deed.").

> boating and all such other purposes as may be permitted by the said Grappone, Inc.

The Policy, Schedule A, Exhibit A. According to plaintiffs, the plan referenced in both their deed and the Policy shows Lot 12 with 200 feet of shore frontage on Lake Winnipesaukee. Plaintiffs' memorandum (document no. 14-1) at 2.

In April of 2010, the owner of property adjacent to Lot 12 brought a quiet title action in the New Hampshire Superior Court, claiming title to approximately 35 feet of Lot 12's shoreline frontage (the "Cooper Litigation"). In that state proceeding, Ms. Cooper asserts that she holds title to the disputed shoreline property by virtue of: (a) adverse possession; and (b) the placement of an iron pin survey marker. If she were to prevail, Lot 12 would obviously have less shoreline and beachfront than is shown on the plan referenced in both the Desjardins' deed and their title insurance policy. So, rather than enjoying an easement affording them access to some 200 feet of waterfront and beach area, the Desjardins would have a right to use only 165 feet of waterfront and beach area on Lot 12.

Upon learning of the Cooper Litigation, the Desjardins made demand upon Fidelity, asserting that they were entitled to coverage under the Policy. While the Desjardins do not assert

that the Policy provides coverage for Ms. Cooper's adverse possession claim, they do say it provides coverage for her claim to a portion of Lot 12 by virtue of the placement of a boundary monument. See Plaintiffs' Reply Memorandum (document no. 18) at 3. Fidelity denied the Desjardins' claim, concluding that the Policy provides coverage for neither Ms. Cooper's adverse possession claim, nor her survey claim. This litigation ensued.

Invoking the provisions of Chapter 491, New Hampshire Revised Statutes Annotated, the Desjardins seek a declaration that Fidelity owes them coverage under the Policy, in particular, an obligation to intervene in the Cooper Litigation and defend their title interests (count one). They also assert that Fidelity is liable to them for breach of contract (count two). As noted above, the parties have filed cross-motions for summary judgment, in which each side claims entitlement to judgment as a matter of law.

## Discussion

I. The Insurance Policy.

A. General Provisions.

The relevant language provides that, "This Policy insures your title to the land described in Schedule A." The Policy,

"Owner's Coverage Statement" (emphasis supplied). The Policy defines the terms "land" and "title" as follows:

> Land - the land or condominium unit described in Schedule A and any improvements on the land which are real property.
>
> * * *
>
> Title - the ownership of your interest in the land, as shown in Schedule A.

Id., "Definitions." As noted above, the Policy's detailed (i.e., metes and bounds) description of the insured "land" includes both the lot on which the Desjardins' home is located (Lot 3), as well as their easement over Lot 12.

Two of the Policy's "Covered Title Risks" are directly implicated in this proceeding and the relevant Policy provisions are as follows:

> This Policy covers the following title risks, if they affect your title on the Policy Date.
>
> 1. Someone else owns an interest in your title.
>
> * * *
>
> 14. Other defects, liens, or encumbrances.

Id., "Covered Title Risks." The coverage provided by the Policy is, however, subject to certain standard exceptions. Those

exceptions state, in relevant part, that the Policy does not provide coverage:

> against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of the following:
>
> * * *
>
> 1. Rights or claims of persons and/or parties in possession [e.g., those claiming title by adverse possession].
>
> 2. Easements or claims of easements not shown by the public records, boundary line disputes, overlaps, encroachments, title to filled lands (if any), and any matters not of record which would be disclosed by an accurate survey and inspection of the premises.

Id., Schedule B (emphasis supplied). If that were the extent of the relevant Policy language, plaintiffs' claims related to the Cooper Litigation would not be covered. The exceptions set forth above plainly disclaim coverage for the types of claims Ms. Cooper is advancing in the state court quiet title action: adverse possession and a boundary dispute based upon the placement of a surveyor's monument.

Critically, however, Schedule B of the Policy concludes with the following language:

> Exception numbered 3 [dealing with mechanic's liens and not relevant to this proceeding] is hereby deleted from the Owner's Policy. Exceptions Numbered 1 and 2 of the Owner's Policy [dealing with adverse possession and

> boundary disputes] do not limit the coverages described by the Covered Title Risks set forth in the Cover of the Owner's Policy.

Id. That language apparently negates the exception carving out boundary disputes and, at best, is confusing. Plainly, its author knew how to simply "delete" an exception to the Policy, as was done with respect to Exception 3. Construing the precise meaning of the qualifying language used to modify Exceptions 1 and 2, and discerning its effect on the scope of coverage provided by the Policy is central to resolving the parties' dispute.

B. Standard Title Policy Exceptions.

The noted exceptions for "parties in possession" and "boundary disputes" are fairly typical of title insurance policies. See, e.g., Panciocco, 147 N.H. at 615. See generally C. Szypszak, 17 New Hampshire Practice, § 7.04[A] (1st ed. 2003) ("Standard Exceptions"). The purpose of such exceptions is to protect the insurance company from potential liability that could not be foreseen by simply reviewing public records, like those maintained at the registry of deeds. So, for example, with regard to the exception for "parties in possession," the New Hampshire Supreme Court has observed:

> When a person, who does not appear in the chain of title, is found in possession of property it may

> indicate, for example, that he is making claim to the property by adverse possession, or that he is claiming under an unrecorded deed. A title examiner, however, seldom visits the land the title to which he is concerned with. Thus, both to protect themselves and to put their client on notice of this state of affairs, title examiners and title insurance companies generally exclude from their title opinions and policies claims of parties in actual possession of the land insured.

Id. (quoting Cheverly Terrace P'ship v. Ticor Title Ins. Co., 642 A.2d 285, 289 (Md. App. 1994)). See generally B. Burke, Law of Title Insurance, § 9.03 ("Exception for Acreage, Boundaries, and 'What an Accurate Survey Would Disclose'") (3d. ed. 2000).

The same is true with regard to the standard exception for boundary disputes (typically known as "the survey exception"). Because the precise location of boundary-defining monuments can only be determined by an examination of the property and an accurate survey, title insurance policies frequently except coverage for boundary disputes. As the New Jersey Supreme Court has noted:

> The purpose of the survey exception is to exclude coverage when the insured fails to provide the insurer with a survey. From a search of relevant public records, a title company cannot ascertain the risks that an accurate survey would disclose. It is for this reason that the title company puts that risk on the insured, who can control it either by obtaining a survey or arranging for the elimination of the survey exception. Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of public records, but by an accurate survey.

Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 533-34, 562 A.2d 208, 217 (N.J. 1989) (citations omitted). See also Stull v. First Am. Title Ins. Co., 745 A.2d 975, 978 n.5 (Me. 2000) ("Experts at trial testified that the survey exception is designed to prevent a title insurer from becoming involved in disputes over where the land described in the policy is actually located on the face of the earth. It is normally waived when the insured conducts a survey, but no survey had been performed in the present case.").

The existence of those exceptions to coverage gives rise to the following logical implication: absent such exceptions, the typical title insurance policy does provide coverage when an abutter claims title to a portion of the insured's property, whether by adverse possession or, as in this case, by virtue of the placement of a disputed boundary marker. In other words, the exceptions exist to disavow coverage that the typical title insurance policy would otherwise provide. Consequently, insureds can often obtain coverage under a title insurance policy for boundary disputes simply by having the relevant exceptions deleted. See, e.g., Walker Rogge, 116 N.J. at 533-534, 562 A.2d at 217 (noting that an insured can obtain coverage for risks excepted from the policy by "arranging for the elimination of the

survey exception.”). <u>See also</u> C. Szypszak, 17 New Hampshire Practice, § 7.04[A] (“Coverage for the parties in possession, mechanics’ lien, and survey exceptions are typically available on loan policies, and sometimes on owner’s policies, based on certain additional assurances . . . . The term of art is ‘deleting’ the exception, which by operation of the double negative means the matter is covered.”).

C. The Qualifying Language.

As noted above, Exceptions 1 and 2 were not “deleted” from the Policy. Rather, their application was qualified: “Exceptions Number 1 and 2 of the Owner’s Policy <u>do not limit</u> the coverages described by the <u>Covered Title Risks</u> set forth in the Cover of the Owner’s Policy.” The Policy, Schedule B (emphasis supplied). Although it is unclear from the record, it is not unreasonable to presume that the qualifying language was employed to make clear that, by negating application of the standard exceptions, the insurance company was not in any way augmenting coverage otherwise provided by the Policy. <u>See, e.g.</u>, B. Burke, <u>Law of Title Insurance</u>, § 9.03 (noting that an “exception is not the opposite of coverage and so eliminating it does not automatically provide coverage”). To obtain coverage under the Policy, the insureds would still have to point to a covered risk specifically identified in the Policy. And, says Fidelity, because none of

the Policy's "Covered Title Risks" is implicated by the claims advanced in the Cooper Litigation, the Policy does not provide coverage. The court disagrees.

I. Count One - Declaratory Judgment.

The Policy describes the insured "land" to which the Desjardins hold "title" as including both the lot on which their home stands and the appurtenant easement over Lot 12 for bathing and boating. Plainly, then, the Policy insures the Desjardins' interest in the easement. And, even if one could plausibly argue that the Policy's language is ambiguous on that score, under applicable New Hampshire law, that ambiguity must be construed in favor of the insureds and against the insurer. See Panciocco, 147 N.H. at 613. If, as Fidelity suggests, the Policy was not intended to provide title insurance coverage for the easement, it should not have included the easement in Exhibit A's description of the "land" covered by the Policy. See, e.g., Havstad v. Fidelity Nat'l Title Ins. Co., 58 Cal. App. 4th 654, 660 (1997) (involving a title insurance policy issued by Fidelity, expressly providing that "the term 'land' does not include any property beyond the lines of the area described or referred to in Schedule

A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.").[2]

Alternatively, if Fidelity wished to clearly express its intention to disavow coverage for the easement over Lot 12, it could have listed that recorded easement along with all the other easements affecting the Property that are expressly disclaimed from coverage under the Policy. See The Policy, Schedule B ("This Policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reasons of the following: [listing a number of easements and encumbrances affecting the Property, such as an easement for "flowage and drainage," various utility easements, and an easement "to obtain water from a certain well located on Lot 3."]).[3]

---

[2] Of course, to be fair, Liberty did not draft the policy language at issue in this case; that was done by its predecessor in interest. Still, the concept of specifically excluding appurtenant easements on or over the property of others (i.e., servient estates) from insurance coverage provided to the dominant estate is not one that is foreign to Liberty.

[3] The court recognizes that the easements excepted from coverage burden the Desjardins' estate, whereas the easement at issue in this case benefits their estate. Still, the point remains the same: if Fidelity did not wish to extend coverage to the easement affording use of Lot 12, it could have unambiguously excepted such coverage in the Policy's language. It did not. Instead, it did just the opposite: it defined the insured land to include the easement over Lot 12, and then negated application of exceptions that would have otherwise disclaimed coverage.

So, having determined that the Policy insures the Desjardins' interest in the easement over Lot 12, the next question is whether Ms. Cooper's claim in the state court litigation implicates one (or more) of the Policy's Covered Risks. It does. Ms. Cooper asserts that she owns a portion of Lot 12 - a claim which, if successful, would substantially diminish the Desjardins' existing easement rights. It follows that "someone else [is claiming she] owns an interest in [the Desjardins'] title." The Policy, "Covered Title Risks." Additionally, Ms. Cooper's asserted title to a portion of Lot 12 also falls into the category of "other defects, liens, or encumbrances" upon the Desjardins' title to "the land," as defined - that is, Lot 3 and the inseparable easement to use Lot 12 for swimming and boating. Id.

Because Ms. Cooper's boundary monument claim is a "Covered Title Risk" with respect to plaintiffs' title to their land (as defined), and because the survey exception does not limit the Policy's coverage for that risk, the Desjardins are entitled to coverage.

II. Count 2 - Breach of Contract.

In count two of their complaint, the Desjardins assert that Fidelity breached the terms of the parties' contract "[b]y their

failure to provide coverage, and denying the Desjardins' claim." Complaint (document no. 1) at para. 22. Having determined that the Desjardins' are entitled to coverage under the Policy, the court must next address Fidelity's obligations when coverage is implicated. Not surprisingly, the Policy is quite clear on that point:

> We will defend your title in any court case as to that part of the case that is based on a Covered Title Risk insured against by this Policy. We will pay the costs, attorneys' fees, and expenses we incur in that defense. We can end this duty to defend your title by exercising any of our options list in Item 4 of the Conditions.

The Policy, "Company's Duty to Defend Against Court Cases." Item 4 of the Conditions states that:

> After we receive your claim notice or in any other way learn of a matter for which we are liable, we can do one or more of the following:
>
> a. Pay the claim against your title.
>
> b. Negotiate a settlement.
>
> c. Prosecute or defend a court case related to the claim.
>
> d. Pay you the amount required by this Policy.
>
> e. Take other action which will protect you.
>
> f. Cancel this Policy by paying the Policy Amount, then in force, and only those costs, attorneys' fees, and expenses incurred up to that time which we are obligated to pay.
>
> g. Cancel the coverage described in Items 15 or 19 of the Covered Title Risks by paying our maximum

> dollar limit of liability referred to in those items and only those costs, attorneys' fees and expenses incurred up to that time which we are obligated to pay.

Id., "Our Choices When You Notify Us of a Claim."

Here, in response to the Desjardins' notice of claim, Fidelity denied coverage. Not only did it refuse to represent the Desjardins' interests in the Cooper Litigation, but it also refused (or neglected) to invoke any of its other options set forth under item 4 of the Policy's "Conditions." That was plainly in breach of its obligations under the Policy. As a consequence, the Desjardins were forced to provide their own legal representation, presumably incurring costs and, perhaps, legal fees for which Fidelity should have been responsible. Going forward, Fidelity can obviously decide which of the options set forth above it wishes to pursue (e.g., attempt to negotiate a settlement with Ms. Cooper, step in and represent the Desjardins' interests in the litigation, etc.). But, that does not render moot the Desjardins' claim that they have already suffered consequential damages - in the form of costs and perhaps attorney's fees - as a result of Fidelity's breach.

As to count two of their complaint alleging that Fidelity breached the terms of the Policy, the Desjardins are entitled to judgment as a matter of law.

**Conclusion**

The Policy, properly construed, provides the Desjardins with coverage for Ms. Cooper's claim that she holds title to the disputed 35 feet of shore frontage on Lot 12 by virtue of the placement of a boundary marker. But, even if one could plausibly argue that the relevant language is ambiguous on that point, it must be construed in favor of coverage, since the Policy may be reasonably interpreted to provide coverage by a reasonable person in the position of the insureds, based upon more than a casual reading of the Policy as a whole. It necessarily follows that Fidelity improperly denied the Desjardins' request for coverage. Accordingly, the Desjardins' motion for summary judgment as to both counts in their complaint (document no. 14) is granted and Fidelity's motion (document no. 12) is denied.

The Desjardins are entitled to an award of damages consisting of the costs and attorney's fees reasonably incurred in representing their interests in the Cooper Litigation. They are also entitled to an award of costs and attorney's fees reasonably incurred in successfully prosecuting this declaratory

judgment suit. See RSA 491:22-b. Those sums should be easily calculated and the court will assume that the parties are capable of coming to an agreement on that issue. If, however, they are not able to agree on the sums to which the Desjardins are entitled, the parties shall notify the court, which will either schedule a damages hearing or, if plaintiffs believe they are entitled to a jury trial on their contract damages, it will issue an appropriate briefing order.[4]

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

June 14, 2013

cc: Christopher T. Meier, Esq.
Lisa S. Wade, Esq.

[4] Although plaintiffs have requested a jury trial, neither party has addressed whether they are actually entitled to one on the issue of damages for their breach of contract claim, when those consequential damages appear to consist entirely of court costs and attorney's fees. The court will require additional legal briefing on the issue.